UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
KEITH KNOESEL,

          Petitioner,

    -against-

GEORGE DUNCAN,

          Respondent.
-----------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★   AUG 3 0 2006   ★

P.M. _____
TIME A.M. _____

**MEMORANDUM and ORDER**

03-CV-2792 (SLT)

**TOWNES, United States District Judge:**

Petitioner, Keith Knoesel, proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2000 conviction in the Supreme Court of the State of New York, Queens County, on various grounds. For the reasons stated below, this petition is denied.

## BACKGROUND

On August 10, 1998, police discovered the decomposing body of one George Capobianco inside Capobianco's Queens apartment. Capobianco had been stabbed several times in the torso and had a laceration to the head. Upon investigation, the police discovered, *inter alia*, that Capobianco's car was missing. The next day, police located Capobianco's car and arrested petitioner and his co-defendant, Steven Smelefsky, as they attempted to enter it. Petitioner was subsequently indicted on three counts of murder in the second degree; two counts of robbery in the first degree; two counts of burglary in the first degree; three counts of burglary in the second degree; one count of robbery in the second degree; and other lesser offenses, including two counts of grand larceny in the fourth degree. In June 2000, petitioner went on trial before Justice Robert Hanophy and a jury in the Supreme Court of the State of New York, Queens County.

The Trial

The prosecution called 16 witnesses, who described both the manner in which Capobianco's body was discovered and the investigation which followed that discovery. The first of these witnesses, Police Officer Margaret Sullivan, testified that on August 10, 1998, she responded to a call complaining of a "foul odor" emanating from Apartment F-44 at 62-09 84th Street in Middle Village, Queens (T. 462).[1] Upon gaining access to the apartment, Sullivan found that it had been ransacked and that there were blood stains all over the couch in the living room (T. 464-69).

Both the 104th Precinct Detectives Squad and the Crime Scene Unit arrived at the scene shortly thereafter. Detective Angelo Paccione of the 104th Precinct arrived at the apartment with his partners, Detectives Collins and Marsigliano, and observed, *inter alia*, a body lying in a pool of blood in a bedroom, an upended glass-topped coffee table in the living room and evidence that a television and a computer had been removed from the apartment (T. 627-28). Detective Corinne Currie of the Crime Scene Unit not only corroborated Paccione's description of the crime scene (T. 517-18, 528), but testified that she was able to lift an Adidas sneaker print from the glass top of the coffee table (T. 529). She also found a broken, brown-glass Schnapps bottle in the living room, but was unable to recover any fingerprints from its sticky surface (T. 525, 532). In addition, Currie noticed blood splattered on the wall behind the living room sofa and bloody "drag marks" along the wall of the hallway leading to the bedroom (T. 520). In the bedroom, she found a bloated, discolored, maggot-infested body, which had been decomposing for "several days" (T. 518).

---

[1]Numbers in parentheses, preceded by "T," refer to pages in the trial transcript.

Currie took photographs of the crime scene, including two which showed portions of the body. One showed only Capobianco's leg from the knee down, but the other depicted Capobianco's head and torso. Defense counsel, who described the latter photograph as showing a discolored body, "decomposing with internal organs herniating out through openings in the body" and "covered with maggots" in places, strenuously objected to the introduction of this photograph as "vile and revolting and disgusting" (T. 499). Defense counsel further argued that the photograph had no probative value, since he was prepared to stipulate that Capobianco "died as a result of multiple stab wounds . . . on the night of July 31st to August 1st" (T. 499). However, after the prosecution announced that it would refrain from publishing the photograph depicting Capobianco's decomposing torso until after the close of evidence, Justice Hanophy agreed to admit both photographs (T. 504-07). In so doing, Justice Hanophy commented that he could not tell whether the photograph of Capobianco's decomposing head and torso was "a body or a rug on the floor" (T. 506).

After leaving the apartment, the detectives canvassed the building, interviewing neighbors (T. 632). Although the detectives never located an eyewitness to the crime itself, they ultimately found one Leonid Okun, a friend of Capobianco's who had been in Capobianco's apartment on the night of July 31, 1998. At trial, Okun testified that he had been having a drink and watching television in Capobianco's apartment around 11 p.m. that evening when someone rang the doorbell from the lobby (T. 606-08). Capobianco buzzed them into the building and opened the door to the apartment, telling Okun that it was "Keith" and that he and Keith went "way back" (T. 608). A half-minute later, two men entered the apartment through the open door. "Keith" introduced the other man to Capobianco, who then introduced both men to Okun (T.

3

608-09). Okun did not know either of the men, but subsequently identified "Keith" as petitioner (T. 609-10).

All four men sat in the living room of the apartment for 10 to 15 minutes, watching Capobianco's 25-inch television (T. 607, 612). Okun testified that both "Keith" and his friend seemed "exhausted" or "very tired," and that Keith appeared to be nodding off (T. 611, 622). Although Okun did not recall seeing either man drinking or using drugs (T. 613), he testified that both men "appeared . . . to be high on drugs" at the time (T. 621). Okun left the apartment at 11:15 or 11:20 p.m., at which time the apartment was still "nice and neat," with "everything" – including the glass-topped coffee table – "perfectly intact" (T. 607).

While other detectives were canvassing the neighbors, Detective Paccione traveled to Suffolk County to speak with Capobianco's mother, Matilda, and brother, Frank. These relatives informed Paccione that Capobianco owned a car – a tan or gold 1991 Lincoln Continental – which he kept in the garage of his apartment building (Matilda Capobianco: T. 478; Det. Paccione: T. 634, 693). When Paccione was unable to locate the car upon his return to Capobianco's building, he issued an "alert" – or all points bulletin – for the car (T. 634).

At approximately 10:50 on the morning of August 11, 1998, while patrolling the 104th precinct, Police Officers Thomas Elsasser and Robert Edwin spotted the unoccupied Continental parked on Gates Avenue (Elsasser: T. 540). The officers radioed Paccione (Paccione: T. 636), then kept the car under surveillance (Elsasser: 542). Elsasser testified that he had been watching the car for only 10 minutes when two men, who had been sitting on the stoop of 17-24 Gates Avenue, approached the car (T. 522-24). One, later identified as petitioner, got in the back seat of the car, while another man, later identified as Steven Smelefsky, used keys to open the trunk

4

of the car (T. 545). Elsasser and Edwin, with the help of a another unit from the 112th precinct, immediately arrested the two men (T. 546-49).

Paccione arrived on Gates Avenue around noon on August 11, 1998, to find petitioner and Smelefsky sitting in the back of separate patrol cars (Paccione: T. 636-37). As Paccione was removing petitioner from the car, he noticed that petitioner was wearing Adidas sneakers with red droplets of what appeared to be blood on the tops of them (T. 639-41). After both petitioner and Smelefsky were removed to the 104th precinct, Paccione's partner, Detective Marsigliano, removed petitioner's shoes and sent them to the forensic biology lab for testing (T. 640). These same sneakers, along with the glass coffee-table top and the prints Currie had lifted therefrom, were subsequently delivered to the FBI laboratory in Washington, D.C. (T. 644).

Around 3:30 that afternoon, Paccione and another partner, Detective Collins, interviewed petitioner (T. 645). Within two or two and one-half hours, petitioner wrote a statement which was both introduced into evidence and read into the record at trial. In that statement, petitioner alleged that he had been invited to Capobianco's apartment that evening, and had arrived there around 11 p.m. to find Capobianco in the company of another man (T. 653-54). Petitioner had then fallen asleep on the couch, and had been invited by Capobianco to take a nap in the bedroom (T. 654).

According to petitioner, he was awakened by a "loud crash" and "some commotion" about an hour-and-a-half later (T. 654, 656). Petitioner then emerged from the bedroom to find a broken bottle and Capobianco lying on the floor in a pool of blood (T. 654). Petitioner, who claimed he was a "good friend" of Capobianco's and had known him for 20 years, panicked (T. 654). Smelefsky, meanwhile, told petitioner "he would hurt [petitioner's] family if [he] said

5

anything," and ran out of the apartment (T. 654). Petitioner acknowledged having cut his hand in the apartment, but claimed he could not recall how he had done so (T. 656).

In his statement, petitioner stated that he did not call the police because he was afraid for the safety of his wife and children (T. 654). Instead, he returned to the apartment building with Smelefsky the next day, where the two men "grabbed" Capobianco's car (T. 654). They also removed Capobianco's television and computer, although it is unclear from the statement whether they did so on the same day they stole the car or the day after (T 654).

Petitioner implied that Smelefsky alone had fenced the stolen property, stating that "Steve sold some of his things in pawn shops" (T. 654) and that petitioner only "waited out in the car when he went in" (T. 655). Petitioner also stated that Smelefsky "must have grabbed [Capobianco's] credits cards" before leaving the apartment on the night of the murder, and subsequently not only showed petitioner the cards but allowed petitioner use them (T. 654). Petitioner admitted using Capobianco's credit cards "for some cash advances" and specifically recalled using his "Discover Card at the 7-Eleven on Lefferts" (T. 654-55). However, petitioner claimed that it was "mostly Steve" who used the cards, and implied that he had done so only because he needed the money to keep his family safe (T. 654).

After petitioner finished writing his statement around 5:30 or 6:00 p.m., Paccione and Collins conferred with other detectives who had just finished interrogating Smelefsky (T. 659). After conferring for about an hour, Paccione and Collins re-entered the interview room and informed petitioner that his version of events was "not the same" as Smelefsky's (T. 661). According to Paccione, petitioner – who had been "very cooperative" throughout the interrogation – then "opened up . . . [and] changed his story" (T. 661). Petitioner subsequently

6

wrote a second statement, which was also introduced into evidence and read into the record (T. 662-64).

The second statement differed from the first in several significant respects. First, petitioner admitted that he and Smelefsky went to the apartment that evening to rob Capobianco of drugs and money (T. 662-63). Although petitioner still maintained that he had fallen asleep after entering the apartment, he testified that Smelefsky had awakened him and said, "now is the time" (T. 663). Petitioner admitted that he had "hit [Capobianco] with a bottle" and that "Steve had stabbed him" (T. 663). Although petitioner stated that he received a "deep cut" on his left hand "when Steve stabbed George" (T. 665), he did not provide any further details concerning the murder, saying only, "[t]he next thing I knew he was lying there dead" (T. 663). However, petitioner implied that he had not intended to kill Capobianco, claiming that he asked Smelefsky, "Why did you do that?" (T. 663). Petitioner continued to maintain that Smelefsky had threatened to kill his family if he said anything (T. 663).

Petitioner stated that he and Smelefsky had returned to the apartment the next day, and had "cleaned out the apartment and sold his stuff" (T. 663). Petitioner provided a detailed account of how they had done this, stating:

> I went into the garage and took George's car to put the stuff in. I parked it on 84th Street. It took two trips to carry all the stuff to George's car. We put the big TV in the trunk and everything else in the back seat. Steve and I took the stuff in George's car to the House of Treasure [sic] and sold some stuff for about $300. The rest of the stuff we drove to drug spots and pawn shops and sold the rest of the items. The ounce of coke that I took I kept a little and sold the rest for $600. Steve and I drove to Lefferts Boulevard and I used the Discover Card to get $300 from George's account. We went to the other ATM . . . and then we got high (T. 664).

7

Although petitioner still implied that he had sold Capobianco's possessions and used his credit card only because he "had to get [his] family away" (T. 663), he admitted that he and Smelefsky spent most of the proceeds on drugs (T. 665). Although petitioner maintained that Smelefsky was constantly "threatening to kill my family so I tried to keep him away from my house," he stated that he went home in the company of Smelefsky after seeing police cruisers and the medical examiner's car parked in front of Capobianco's building (T. 665). He explained:

> We went to my house and helped [petitioner's common-law wife]
> Donna pack because I wanted to leave. I was going to give her
> money to go to Texas (T. 665).

Petitioner did not claim that Smelefsky made any effort to prevent Donna from leaving, but stated that Smelefsky remained in the house all night, then left the house with petitioner to collect petitioner's back wages from the company where petitioner and Smelefsky had both worked (T. 665). Thereafter, petitioner then went to Smelefsky's home to shower and change. He was arrested as he left Smelefsky's apartment to get back in the car (T. 665).

After making this statement, petitioner was placed in a lineup viewed by Okun, and then gave a videotaped statement at around 1:20 a.m. on August 12, 1998 (T. 566-70). In that videotape, which was played for the jury (T. 673), petitioner conceded that the first written statement was inaccurate and repeated much of what he had said in the second written statement. However, in his videotaped statement, petitioner expressly denied that he ever intended to kill Capobianco, stating that he had only agreed to rob him and was surprised when Smelefsky stabbed him. Petitioner also repeatedly reiterated that Smelefsky had threatened to kill petitioner's family if petitioner said anything about the crime.

Later on August 12, 1998, the police visited the House of Treasures and arrested the owner, Dario Quezada, for possession of stolen property (Quezada: 564, 571-72). Quezada, who

8

had pled guilty to the charge and paid a $250 fine by the time of trial, testified in this case that he had purchased a television and a computer from petitioner sometime between August 1 and August 11, 1998. (T. 564). He further testified that petitioner – whom he knew as "Keith" – visited the store twice during that period, and had entered alone both times (T. 562-64, 570). However, on both occasions, Quezada accompanied petitioner outside to a Lincoln Continental where, on one of those occasions, he had seen "somebody inside the car sitting on the driver's side" (T. 569). Although Quezada initially could not recall when he saw this second person (T. 571), he later testified that he saw the person upon petitioner's first visit to the store (T. 580). However, Quezada consistently testified that the second person was not present on one of the two occasions (T. 571, 580).

On the same day that police arrested Quezada, Detective Dennis Brooks executed a search warrant at Smelefsky's apartment at 17-24 Gates Avenue (T. 586-37). There, in a bedroom closet, Brooks recovered a black bag containing Capobianco's personal papers, such as credit card receipts and bills (T. 589). That bag also contained a notepad on which someone had made two sketches (T. 589). One sketch, labeled "George's apartment," was of the interior of Capobianco's apartment, while the other was of the hallway of Capobianco's apartment building (T. 589). Brooks did not know who had prepared the sketches, but testified that Paccione had subsequently taken the sketches to the police lab for handwriting analysis (T. 594-95, 598).

The following day, Brooks received a telephone call from one Lizabeth Sosebee, petitioner's niece (Brooks: T. 596; Sosebee: T. 812). Sosebee, then 18 years old, told Brooks about conversations which she had had with petitioner sometime during the first week of August 1998 (T. 799). At trial, a 20-year-old Sosebee repeated her account of those conversations.

9

According to Sosebee, she was at the 76-66 Austin Street home she shared with her grandmother – petitioner's mother – when she received a telephone call from petitioner, saying he was "in trouble" (T. 790). When Sosebee asked him what had happened, petitioner told her, "We killed somebody" (T. 790). Although Sosebee subsequently recounted this statement as, "we killed someone" (T. 790) or "we murdered someone" (T. 810), she insisted on cross examination that she was "one hundred percent positive he said 'we'" (T. 810).

After Sosebee ascertained that petitioner was calling from a nearby pay phone, she invited petitioner to come over and talk to her (T. 791). Petitioner arrived alone about 15 to 20 minutes later (T. 791, 798). According to Sosebee, he immediately told her that "Steve" had either stabbed or killed "George" (T. 811), and then provided an account of what had happened.

Petitioner told Sosebee that he and Steve had met George outside a bar, and that George had invited them to his apartment. Petitioner reportedly told Sosebee that he was in the bathroom when he heard arguing, and that he exited the bathroom to see Steve stabbing George and George struggling (T. 794). According to Sosebee, petitioner claimed not to know why Steve was stabbing George, but nonetheless grabbed George (T. 794-95). Petitioner, who allegedly had cuts both on his forehead and fingers at the time Sosebee spoke with him (T. 795, 815), explained that he had received the injuries when he grabbed George while Steve was stabbing him (T. 815-16).

Sosebee testified that petitioner said he had taken George's car keys prior to leaving George's apartment, and then took his car. Petitioner also told Sosebee he was "very scared," and implied that he had not gone to the police because was too scared to do so (T. 796). During the 20 to 30 minutes he remained in Sosebee's apartment, petitioner paged an old boss, Sal, to ask him about "chop shops," but Sal advised petitioner to "just get rid of the car" (T. 797).

10

After petitioner left the apartment, Sosebee called her mother, father and brother in Texas. Although Sosebee claimed that her father, a lawyer, did not tell her what to do, Sosebee subsequently decided to call the police because she thought it was the "right" and "moral" thing to do (T. 799, 813). She denied that she wanted to hurt petitioner (T. 812-13), and insisted that she had a "fantastic" relationship with petitioner when he was not on drugs (T. 809).

On August 17, 1998 – four days after Sosebee's conversation with Brooks – Sosebee accompanied Donna on a visit to petitioner (T. 802, 821). According to Sosebee, petitioner did not have a good relationship with Donna in early August 1998 (T. 787-83). However, Sosebee testified that, as she listened, petitioner described the murder to Donna, providing details that differed from those he had told Sosebee earlier.

Sosebee testified that petitioner told Donna he was in the bedroom sleeping, rather than in the bathroom, when he heard arguing (T. 803). Petitioner then exited the bedroom and broke a bottle over George's head (T. 803). However, petitioner denied stabbing Capobianco (T. 803). At the close of her direct examination, Sosebee identified a photograph – People's Exhibit 44 – as a photograph of petitioner (T. 806).

Michael Aylward, an Assistant Security Officer at Maspeth Federal Savings ("Maspeth"), testified that Exhibit 44 was a "still" photograph, produced from a video taken by a surveillance camera at Maspeth's 64-19 Woodhaven Boulevard branch between 9:30 and 9:32 a.m. on August 2, 1998 (T. 841). Aylward also testified that Capobianco had a debit card issued by Maspeth, and that said card had been used to withdraw a total of $1,092 during 13 different ATM transactions between 3:35 a.m. on August 1, 1998, and 12:23 a.m. on August 4, 1998 (T. 840-41). Three of those transactions occurred at Maspeth's 64-19 Woodhaven Boulevard branch, but all three of those transactions occurred on August 4, not August 2.

John McKnight, a Regional Investigator for Discover Card Financial Services, testified that Capobianco also owned a Discover Card which had been used to obtain approximately $400 in cash advances on the morning of August 1, 1998 (T. 830-31). However, the credit card had been used on six other occasions between August 2 and August 4, 1998, in unsuccessful attempts to secure further cash advances (T. 831-32). According to Discover Card's records, one of those six attempts was made at Maspeth's 64-19 Woodhaven Boulevard branch on August 2, 1998, at approximately 9:29 a.m. (T. 831).

The prosecution also adduced the testimony of four experts. Detective Richard Picciochi of the New York Police Department's laboratory testified that he had compared writing samples known to have been produced by petitioner and Smelefsky with the sketches from the notepad recovered from Smelefsky's apartment (T. 734). Picciochi, who was qualified without objection as an expert in handwriting analysis, opined that the sketches had been made by petitioner, not Smelefsky (T. 737)

A second expert, FBI Agent Eric Gilkerson, testified that he compared the Adidas sneakers petitioner had been wearing at the time of his arrest with latent footprints recovered from the glass table top in Capobianco's apartment. Gilkerson, who was qualified as an expert in footwear examination and comparison, opined that one of the footprints was consistent with the right sneaker (T. 763), but that another print recovered from the table top was not consistent with either sneaker (T. 765).

A third expert, Mark Desire, testified that he, too, had examined the Adidas sneakers, among other items, in an attempt to recover DNA evidence. Desire testified that he found human blood on the sneakers, and that this blood contained DNA matching Capobianco's (T. 769). After being qualified as an expert in blood spatter analysis (T. 780), Desire was further permitted

12

to testify that a blood stain on one of the sneakers was caused when blood dripped on it, and that this stain could not have resulted from stepping into a pool of blood (T. 780-81).

Finally, Dr. Ambrosi of the New York City Medical Examiner's Office testified that he had performed the autopsy on Capobianco's body. Dr. Ambrosi found that Capobianco had laceration to the head, consistent with being struck over the head with a bottle (T. 855), and recovered a piece of brown glass from Capobianco's clothing (T. 849). However, Dr. Ambrosi implied that Capobianco had not been rendered unconscious prior to the stabbing, testifying that Capobianco had injuries to his palms and fingers that might have been made by a sharp object (T. 854). Dr. Ambrosi testified that Capobianco had been killed by four stab wounds to his torso (T. 850-53, 855).

The Motions at the Close of the People's Case

After the prosecution rested, defense counsel moved to dismiss each and every count of the indictment. Defense counsel not only argued that the People had failed to prove a *prima facie* case as to each of the counts, but advanced specific arguments relating to many of the counts. Two of these arguments are relevant to the issues raised in the instant petition.

First, defense counsel argued that the evidence was insufficient to support two counts of burglary in the second degree. Defense counsel conceded that petitioner's second written statement indicated that petitioner made two trips to the car in the course of looting Capobianco's apartment, but defense counsel argued that both trips were part of a single burglary (T. 867-69). The prosecutor responded by arguing that petitioner committed a new burglary each time he crossed the threshold of the apartment (T. 868). Without discussion, the trial court denied petitioner's motion to dismiss one of the two second-degree burglary counts (T. 869).

13

Second, defense counsel argued that the evidence was insufficient to support one of the two counts of grand larceny in the fourth degree because, although petitioner and Smelefsky allegedly withdrew a total of over $1,000 from ATM machines using Capobianco's cards, these withdrawals occurred over a period of days. Defense counsel argued that each withdrawal was a separate act, and that these withdrawals therefore constituted a series of petit larcenies, rather than grand larceny in the fourth degree (T. 869-70). Although the trial court originally reserved on this issue (T. 871), the court ultimately denied petitioner's motion to dismiss this charge (T. 1123).

The Defense Case

Petitioner, as the lone defense witness, testified in a manner which was largely consistent with his original written statement. Petitioner testified that on the evening of July 31, 1998, he had been at home with his "wife" or girlfriend, her children and Smelefsky, drinking Tequila and watching a movie on television (T. 877). At some point that evening, petitioner received a telephone call from Capobianco, inviting petitioner to Capobianco's apartment (T. 877). Although petitioner was already drunk, he nonetheless accepted the invitation and told Capobianco he would bring Smelefsky (T. 877).

Petitioner and Smelefsky arrived at Capobianco's apartment to find Capobianco in the company of someone petitioner identified as "Lenny" (T. 879). Petitioner "fixed a couple of drinks," then sat down to converse with Capobianco (T. 879). Sometime thereafter, petitioner fell asleep. Capobianco, who was a "friend" of petitioner's and had seen petitioner drunk on prior occasions, awakened petitioner and told him he could nap in the bedroom (T. 879).

Sometime after petitioner had accepted Capobianco's offer, petitioner was awakened by "a loud crash" (T. 880). Still drunk and disoriented, petitioner came out of the bedroom to find

14

Capobianco, apparently dead, lying on the floor with Smelefsky standing over him (T. 880).

When petitioner asked Smelefsky what had happened, Smelefsky instructed petitioner not to talk

about what he had seen and threatened to harm or kill petitioner and his family unless petitioner

remained silent (T. 893). While petitioner was permitted to testify that he believed Smelefsky

would hurt him or his family if he said or did anything (T. 899), petitioner was not permitted to

testify that Smelefsky said he had killed someone else before and had succeeded in getting away

with the murder (T. 882-891).

Petitioner, who denied having any blood on his clothing, waited as Smelefsky changed

his clothes and washed off Capobianco's blood (T. 894). Petitioner and Smelefsky then left the

apartment and "[w]ent to cop some dope" (T. 895). Although petitioner did not deny that money

was stolen from Capobianco's account during the early morning of August 1, 1998, petitioner

testified that he did not realize what was happening because he was "in such a state of shock"

that he "just wanted to get high at that time" (T. 895).

Around 7:30 on the morning of August 1, 1998, Smelefsky and petitioner returned to

Capobianco's apartment. Petitioner testified that he returned only because Smelefsky insisted on

cleaning up the apartment, and that petitioner wiped his fingerprints off the "liquor bottles" he

had touched (T. 897). However, petitioner also admitted to taking about an ounce of cocaine,

which he knew Capobianco kept in the back office, and to assisting Smelefsky in looting the

apartment (T. 898-99). Petitioner testified that he and Smelefsky took "a computer, a VCR a

stereo, [and] a radio" (T. 900), but claimed that they were able to fit all these items in five large

sacks and to carry them down to the car in one trip (T. 901-02). Petitioner made no attempt to

call the police or to elude Smelefsky, testifying that he was afraid for himself and his family (T.

899). Petitioner testified that once he participated in removing property from Capobianco's

15

apartment, he was also motivated to remain silent by the realization that he was likely to be arrested himself (T. 903).

Petitioner and Smelefsky managed to sell most, if not all, of the items they had stolen from Capobianco's apartment. Petitioner testified that, at Smelefsky's suggestion, he and Smelefsky jointly visited the House of Treasures to sell of the property to their mutual acquaintance, "Dario" (T. 905). Smelefsky subsequently sold some remaining items to drug dealers, and pawned other items (T. 906). In addition, petitioner twice used Capobianco's credit cards. Still, petitioner did not use the proceeds to leave the city. Although petitioner claimed that he had told his wife to pack, he also testified that was giving her only "a little money," and using the rest on drugs (T. 907). Indeed, petitioner testified that he remained continually high on drugs from the early morning of August 1, 1998, until his arrest (T. 903).

Petitioner admitted having drawn the sketches which were found in Smelefsky's apartment, but testified that he had done so after the murder and only three days before he was arrested (T. 915). Petitioner testified that Smelefsky, needing the title to Capobianco's car in order to sell it, had asked petitioner to return with him to the apartment (T. 913). When petitioner refused to do so, Smelefsky said he would have one of his friends retrieve the title, but had petitioner draw the diagrams (T. 913-14).

Petitioner testified that he was "kicking drugs" and "irrational" at the time of his arrest (T. 916). Nonetheless, he was able to write out a three-page statement, in which he denied participating in the murder but admitted participating in the subsequently crimes (T. 918). Thereafter, while he was in the throes of drug withdrawal – "curled up" and suffering various physical symptoms – Paccione and Collins returned and coerced him into writing the more incriminatory, second statement (T. 919, 921). According to petitioner, he wrote "exactly what

16

[Collins] told [him] to write" after Collins promised to talk to the District Attorney about a favorable plea bargain (T. 922, 924).

Petitioner also admitted that he had spoken to his niece, Lizabeth Sosebee, both on the telephone and in person following the murder. However, petitioner denied having told Sosebee "we murdered someone," insisting that he had consistently told Sosebee that Smelefsky committed the murder (T. 910). He also denied having told Sosebee that he grabbed Capobianco after emerging from the bedroom to see Smelefsky stabbing him (T. 912-13). In addition, petitioner implied that there was some animus between him and Sosebee, testifying that they had been "on the outs" and "fighting for two years" prior to the incident (T. 909).

Although petitioner never directly accused Sosebee of lying, the prosecutor attempted to force petitioner into doing so on cross examination, asking, "And Liz, she lied, didn't she?" Defense counsel objected, saying, "That's not an appropriate question for the district attorney to ask to have a witness characterize someone else's testimony" (T. 929). The court immediately sustained the objection, saying, "That's absolutely true. Sustained." (T. 929). Although petitioner had already answered the question in the affirmative by the time the objection was made, defense counsel did not request that the answer be stricken.

On cross examination, the prosecution raised questions concerning petitioner's credibility by pointing out, *inter alia*, that the sketches appeared to portray the apartment prior to the ransacking (T. 932-33). The prosecutor also presented a possible motive for the crime by adducing testimony that petitioner had been fired from his job a few days before Capobianco was murdered (T. 938), but that he told his wife/girlfriend he was still working (T. 988).

At the close of the defense case, the prosecution asked that the photograph of Capobianco's decomposing body be published to the jury. Justice Hanophy originally declined

17

to do so, noting that both parties agreed that Capobianco had been dead for eleven days at the time the photograph was taken and saying, "I don't know what that photo would show at this time" (T. 1031). In response, the prosecution argued that the photograph showed that the decomposition made it impossible to determine that there was a laceration to Capobianco's head and that, since this laceration was first discovered during the August 11, 1998, autopsy, Paccione and Collins would not have known about it at the time they allegedly dictated the statement to petitioner (T. 1032). Although defense counsel argued that the detectives might have learned of the laceration from the medical examiner who responded to the crime scene or from their interrogation of Smelefsky (T. 1034), the trial court was persuaded by the prosecution's argument to permit publication of the photograph (T. 1033).

The trial court then conducted a charge conference, at which the prosecution dismissed 8 of the 23 counts, including one count each of burglary in the first and second degrees and one count of robbery in the second degree. The court also dismissed one of the two counts of grand larceny in the fourth degree, leaving in the count which charged petitioner with committing that crime by stealing property having an aggregate value of over $1,000. Defense counsel requested a charge relating to the jury's consideration of petitioner's statements, but made no specific requests concerning the charge relating to the definition of burglary.

In the course of charging the jury on the crime of burglary in the first degree, the trial court instructed the jury that a person could be guilty of the crime if "he knowingly remain[ed] unlawfully in a dwelling with intent to commit a crime therein" and caused physical injury to a non-participant in the crime (T. 1155). The court then charged:

> According to the law, a person remains unlawfully in a dwelling when that person has no license or privilege to remain in that dwelling (T. 1156).

18

Following the charge, defense counsel objected to this instruction, among others, stating:

> I object to the charge with regard to "remains unlawfully" . . . .
> "Remains unlawfully" you said means no license or privilege to
> remain. I believe that it is appropriate to add that when a person
> has entered with license or privilege, what it is that transforms that
> into remaining unlawfully which I believe is defined an order oral
> [sic] or personally communicated . . . (T. 1194).

The trial court declined to amend the burglary charge to include the language requested by

defense counsel (T. 1195).

During deliberations, the jury asked the court, *inter alia*, to explain the difference

between counts 10 and 11, both of which charged petitioner with burglary in the second degree.

The court responded:

> [T]here really isn't any difference between those two. It's the
> People's theory that the defendant on two different occasions went
> into the apartment after the alleged murder, so the reading is the
> same as to both counts. It's two different events or two different
> times, if you will (T. 1202).

After this supplemental charge, defense counsel attempted to note his objection. However, as

soon as defense counsel indicated that he was making the "same objections that [he] . . . made

earlier," the court cut him off, saying, "Same answer" (T. 1215).

The jury subsequently returned a verdict, finding petitioner guilty of all 15 counts

charged. At sentencing, petitioner was arraigned as a second felony offender on the basis of his

1991 Texas conviction for third-degree aggravated assault. Defense counsel argued that the

Texas crime was not equivalent to a felony assault under New York law because one could be

convicted of aggravated assault in Texas for merely threatening to cause physical injury, rather

than actually causing such injury. However, the trial court rejected this argument, and sentenced

petitioner as a second-felony offender to prison terms totaling 65 years to life.

<u>Petitioner's Direct Appeal</u>

Petitioner raised seven issues upon appeal to the Appellate Division, Second Department. The first two issues both related to evidentiary rulings. First, petitioner argued that the trial court violated his Fourteenth Amendment right to present a defense by precluding him from testifying that Smelefsky had, in the course of threatening to kill petitioner and his family, stated that he had committed a prior murder. Second, petitioner argued that the trial court abused its discretion by permitting the prosecution to introduce the photograph of Capobianco's maggot-infested body.

In his third point, petitioner argued that the evidence was insufficient to support his conviction on two counts of burglary in the second degree. Petitioner argued that although he had made two trips to the car while removing items from Capobianco's apartment, both trips were part of a single transaction and therefore did not constitute two separate burglaries. In Point 4, petitioner argued that the evidence was insufficient to prove him guilty of grand larceny in the fourth degree because there was no proof that he stole $1,000 during a single transaction, but only evidence that he stole a total of $1,000 during a series of petit larcenies.

In his fifth point, petitioner argued that the trial court failed to properly charge the jury on one of the elements of burglary in the first degree. Specifically, petitioner asserted that because he had lawfully entered Capobianco's apartment, he could only be convicted of burglary in the first degree if he remained unlawfully in the apartment after the murder. Petitioner argued that the court was therefore required to charge that the jury could not find that petitioner remained unlawfully in the apartment unless it found that Capobianco orally revoked permission to remain in the apartment sometime prior to his death.

20

In his sixth point, petitioner argued that the prosecutor violated his Fourteenth Amendment Due Process right to a fair trial by cross-examining petitioner about Sosebee's veracity. Petitioner maintained that it was improper under both New York State and Second Circuit jurisprudence for the prosecutor to ask petitioner if he believed his niece had "lied" in testifying that petitioner had confessed to the murder of Capobianco. Finally, in Point 7, petitioner argued that he had been improperly adjudicated a predicate felon.

The Appellate Division, Second Department, rejected these arguments and affirmed petitioner's conviction. *People v. Knoesel*, 293 A.D.2d 551, 742 N.Y.S.2d 60 (2d Dept. 2002). With respect to the evidentiary issues, the Appellate Division held that the trial court "providently exercised its discretion in limiting the defendant's testimony regarding his state of mind at the time of the incident," *id.*, 293 A.D.2d at 551, 742 N.Y.S.2d at 60, and that the photograph of Capobianco's decomposing body "was properly admitted to establish the location and the extent of the victim's wounds and to corroborate evidence that the defendant had struck the victim in the head with a bottle." *Id.*, 293 A.D.2d at 551-52, 742 N.Y.S.2d at 60. The Court also held that the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish the defendant's guilt of burglary in the second degree and grand larceny in the fourth degree beyond a reasonable doubt." *Id.*, 293 A.D.2d at 552, 742 N.Y.S.2d at 60. The Court did not specifically address the other three points raised in petitioner's appellate brief, but stated only, "[t]he defendant's remaining contentions are without merit." *Id.*

Petitioner requested leave to appeal the Appellate Division's order to the New York Court of Appeals, but that request was denied on August 19, 2002. *People v. Knoesel*, 98 N.Y.2d 711, 749 N.Y.S.2d 8 (2002). Less than one year thereafter, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner raises the same seven grounds

21

that he raised on direct appeal, transcribing the point headings almost verbatim in the body of the petition, Petition at ¶ 13, and attaching a nearly complete copy of his appellate brief to the petition.

## DISCUSSION

### I. Five of Petitioner's Seven Grounds for Habeas Relief are Procedurally Barred

Respondent argues that petitioner's second, third, fourth, fifth and seventh grounds for relief are procedurally barred. The federal habeas statute provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . (A) the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. § 2254(b)(1); *see Rose v. Lundy*, 455 U.S. 509, 515-16 (1982). In order to satisfy the exhaustion requirement, a habeas petitioner must give the State courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Taveras v. Smith*, 388 F. Supp. 2d 256, 264 (S.D.N.Y. 2005)(a petitioner is required to present his constitutional claim "to each level of the state court system available to review the claim").

A petitioner must not only "'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review)," but must alert each court "to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)(citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)(per curiam), and *O'Sullivan*, 526 U.S. at 845). Petitioner "need not refer[][to] chapter and verse [of] the U.S. Constitution." *St. Helen v. Senkowski*, 374 F.3d 181, 182 (2d Cir. 2004)(per curiam)(internal quotations and citations omitted, brackets in original), *cert. denied sub nom. St. Helen v. Miller*, 543 U.S. 1058 (2005). A petitioner can alert

22

a State court to the federal constitutional nature of his claim in various ways, including "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982)(en banc). However, "a state court must first have been given appropriate warning as to the federal nature of the claim before a federal court will consider it." *Gonzalez v. Sullivan*, 934 F.2d 419, 423 (2d Cir. 1991).

"[E]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law." *St. Helen*, 374 F.3d at 183 (citing *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). However, federal courts can reach the merits of such procedurally defaulted claims "only if the defendant can first demonstrate either cause and actual prejudice. . ., or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998)(internal quotation marks and citations omitted).

Respondent argues that petitioner's second, third, fourth, fifth and seventh grounds for relief are procedurally barred because petitioner failed to alert the State courts at every level to the federal constitutional nature of his claims. Respondent further asserts that petitioner has shown neither cause for these procedural defaults nor prejudice arising from them, and that there is nothing to suggest that petitioner is actually innocent. For the reasons set forth below, this Court concludes that respondent is entirely correct.

The Second Ground

Although petitioner protested the introduction of photographs of Capobianco's decomposing body at trial, and asserted on appeal that the trial court's decision to admit these photographs constituted an abuse of discretion, petitioner never alerted the State courts to the federal constitutional nature of his claim. Petitioner did not merely fail to cite chapter and verse of the United States Constitution, but made no mention of the Constitution whatsoever. Petitioner did not even argue that the evidentiary ruling violated his Constitutional right to a fair trial, but argued only that the ruling was an abuse of discretion.

Petitioner's decision to characterize this alleged evidentiary error as an abuse of discretion on direct appeal – especially in an appellate brief which specifically alleged that other errors violated the Fourteenth Amendment, *see* Petitioner's Appellate Division Brief ("Pet. Br.") at 14, or (even more specifically) the "Fourteenth Amendment Due Process Right to a Fair Trial," *id.* at 38 – strongly implied that petitioner was raising a State law challenge to an evidentiary ruling. That implication was further supported by the fact that petitioner cited almost exclusively to State law cases. To be sure, petitioner's appellate brief did cite to one federal case – *Ruiz v. Norris*, 868 F. Supp. 1471 (E.D. Ark. 1994) – but only for the proposition that a picture of maggots eating a victim's face is "gruesome." *Id.*, 868 F. Supp. at 1528. There is nothing in *Ruiz*, in which the gruesome pictures were not even introduced, or in any of the State law cases cited by petitioner to suggest that the introduction of photographs of maggot-infested corpses violated any federal constitutional right.

Since petitioner's appellate brief did not present this evidentiary issue in a manner which alerted the Appellate Division "to the federal nature of the claim," petitioner did not exhaust any

federal constitutional issue relating to the introduction of the photographs. Petitioner can no longer exhaust such issue; because he could have raised the issue on direct appeal but failed to do so, he can no longer raise this issue in a motion to vacate the judgment of conviction. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). Accordingly, petitioner has procedurally defaulted on any federal constitutional claim he might have made relating to the photographs of Capobianco's decomposing corpse.

In light of this procedural default, this Court cannot review the merits of this claim unless petitioner demonstrated cause and prejudice or actual innocence. Petitioner has done neither. First, petitioner, who simply transcribed the headnotes from his appellate brief in listing his grounds for habeas corpus relief and never filed a reply brief despite being advised by this Court of his right to do so, has not shown cause or prejudice. In addition, there is nothing to suggest that this is one of those "extraordinary" cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent" and in which this court may grant the writ of habeas corpus even in the absence of a showing of cause for the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). To the contrary, this is a case in which petitioner has consistently admitted being present at the time and place of the murder and having participated in the subsequent looting of the deceased's possessions. In addition, the prosecution adduced evidence that petitioner confessed his involvement in the murder not only to the police, but also to his own niece. Thus, even assuming that the introduction of the photograph of Capobianco's decomposing body was error which rose to the level of a federal constitutional violation, that error did not result in the conviction of an innocent man. Accordingly, this Court

cannot review the merits of petitioner's second ground for relief. *See Bousley*, 523 U.S. at 622.[2]

## The Third and Fourth Grounds

Petitioner's third and fourth grounds for relief raise issues as to whether the evidence adduced at trial was sufficient to prove petitioner's guilt of a second count of burglary in the second degree and one count of grand larceny in the fourth degree under New York State law. Specifically, petitioner's third ground asserts that proof that petitioner twice entered Capobianco's apartment in the course of looting the apartment after the murder was insufficient to prove petitioner's guilt of two counts of burglary in the second degree under New York Penal Law § 140.25(2) because both entries occurred during "one continuing transaction." Pet. Br. at 27. Petitioner's fourth ground argues that evidence that petitioner made numerous ATM withdrawals which together totaled over $1,000 was insufficient to prove grand larceny in the fourth degree under New York Penal Law § 155.30(1).

These arguments are both based on State law. Indeed, in his appellate brief, petitioner not only fails to cite any federal constitutional provisions or federal caselaw, but expressly refers to State law in advancing these grounds for relief. In the third point of his appellate brief, after

_____

[2]Although this Court cannot review this claim on the merits, it notes that it would deny this claim even if it were able to review it. The photograph was probative of the nature and extent of injuries observable by Detectives Paccione and Collins, and the prosecution used it to imply that the detectives would not have known of the laceration to Capobianco's head at the time they allegedly dictated the second written statement (T. 1094). Moreover, since the body as depicted in the photographs was so decomposed that Justice Hanophy professed not to know whether it was "a body or a rug on the floor" (T. 506), it was not likely to appeal to the jury's sympathy or to otherwise prejudice the jury against petitioner. Therefore, this Court concurs with both the trial court's and the Appellate Division's determination that the probative value of this photograph outweighed any prejudice that might have resulted from its admission. Furthermore, even if the admission of this photograph were error, this single evidentiary error would not result in a violation of petitioner's right to a fair trial. *See Crane v. Kentucky*, 476 U.S. 683, 689 (1989).

citing to three State court cases, petitioner states that "not a single case, ever reported in *New York*, supports the proposition, that, each time a burglary [sic] crosses the threshold to take another item, a new burglary may be charged." Pet. Br. at 28 (emphasis added). Similarly, in the fourth point, petitioner reviews the history of the New York State statute defining grand larceny in the fourth degree, then argues – based solely on New York cases – that the prosecution cannot aggregate the amounts stolen in a series of petit larcenies to reach the $1,000 threshold necessary to charge grand larceny in the fourth degree.

Neither of these arguments call to mind a federal right. The handful of exclusively State cases on which petitioner relied in these two points interpreted the New York State statutes at issue, and did not employ federal constitutional analysis. Thus, the claims asserted called to mind State law issues and the facts alleged in support of these arguments were not "well within the mainstream of constitutional litigation." *See Daye*, 696 F.2d at 194.

Since the third and fourth points of petitioner's appellate brief did not suggest any federal claims, any federal constitutional claims which might arguably be raised in the third and fourth grounds of the Petition are unexhausted. Petitioner can no longer exhaust these claims, because he could have raised the issue on direct appeal but failed to do so. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). Moreover, as discussed above, supra at 25, petitioner has demonstrated neither cause and prejudice nor actual innocence. Accordingly, this Court cannot review the merits of petitioner's third and fourth grounds for habeas relief. Even if it could, this Court would not find that either the third or fourth ground alleges a violation of petitioner's federal constitutional rights or any basis for granting federal habeas relief.

27

The Fifth Ground

Petitioner's fifth ground for habeas relief relates to the trial court's charge on burglary in the first degree. In his appellate brief, petitioner alleges that this charge, in which the trial court instructed the jury that petitioner could be convicted if he "knowingly entered or remained unlawfully in the dwelling of George Capobianco with the intent to commit a crime therein," (T. 1155), was "improper" because it failed to specifically define the phrase, "remained unlawfully." Pet. Br. at 34. However, neither petitioner's appellate brief nor the instant petition alleges that this failure to charge amounted to a federal constitutional violation.

Point 5 of petitioner's appellate brief never mentioned the United States Constitution, but relied solely on New York cases. None of the State cases cited by petitioner employed a constitutional analysis. Morever, since "[e]rrors in jury instructions involve issues of state law and thus, rarely provide a sufficient basis for federal habeas review," *McGhee v. Fischer*, No. CV-05-3842 (DGT), 2006 WL 1788185, at *5 (E.D.N.Y. Jun. 26, 2006), the assertion of this claim did not "call to mind a specific right protected by the Constitution,' and the facts alleged in the fifth count were not "a pattern of facts . . . well within the mainstream of constitutional litigation." *See Daye*, 696 F.2d at 194.

Indeed, petitioner's claim in the instant petition that the burglary charge was merely "improper" suggests that petitioner is making a State law claim, not a federal constitutional claim. To overturn a conviction based on a defective jury charge, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Petitioner's assertion that the charge was merely

"improper" suggested that petitioner himself did not believe this error amounted to a constitutional violation.

Even if petitioner could have demonstrated that the trial court's burglary charge somehow violated petitioner's Constitutional rights, petitioner's jury instruction claim would be unexhausted. Petitioner can no longer exhaust these claims; he could have raised the issue on direct appeal but failed to do so. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). Since petitioner has demonstrated neither cause and prejudice nor actual innocence, this Court cannot review the merits of petitioner's fifth ground for habeas relief.[3]

The Seventh Ground

Petitioner's seventh ground for habeas relief is that he "was improperly adjudicated a predicate felon." Because the copy of the appellate brief submitted with the Petition does not contain the section of the discussion which raised this point, the basis for this ground is unclear. However, regardless of whether the basis is identical to that raised in the State courts, this ground could not raise an exhausted, federal constitutional claim.

In the State courts, petitioner argued that he was improperly adjudicated a second felony offender on the basis of a 1991 Texas conviction for third-degree aggravated assault. The issue of whether this Texas conviction qualifies as a predicate conviction in New York is purely a question of State law, to be determined based on "whether the foreign conviction has an

---

[3] If this Court were to review the merits, it would not find that the jury's charge was improper. Judge Hanophy's charge closely tracked the pattern jury instruction contained in the New York Criminal Jury Instructions, 2d edition, which, like Justice Hanophy's charge, does not provide a special definition for the "remains unlawfully" element. *See* N.Y. Crim. Jury Instructions, 2d ed., Penal Law § 140.30(2). Moreover, even if Justice Hanophy's charge was deficient under State law, there is nothing to suggest that it "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *See Cupp*, 414 U.S. at 146.

equivalent among New York's felony-level crimes." *People v. Muniz*, 74 N.Y.2d 464, 467, 548 N.Y.S.2d 633, 635 (1989); *see* N.Y. Penal Law § 70.06(1)(b)(i)(defining an out-of-state conviction as a predicate felony if, *inter alia*, it is "an offense for which a sentence to a term of imprisonment in excess of one year or a sentence of death was authorized and is authorized in this state"). "As a general rule, 'this inquiry is limited to a comparison of the crimes' elements as they are respectively defined in the foreign and New York penal statutes.'" *Somerville v. Conway*, 281 F. Supp. 2d 515, 520 (E.D.N.Y. 2003)(quoting *Muniz*, 74 N.Y.2d at 467-68, 548 N.Y.S.2d at 635). Therefore, if petitioner is advancing the same argument he raised in the State courts, petitioner's seventh ground does not raise a federal constitutional claim and cannot serve as the basis for habeas relief.

On the other hand, if petitioner is raising any issue other than the one he raised in the State courts, his seventh ground is unexhausted. Petitioner can no longer exhaust this claim, because he could have raised the issue on direct appeal but failed to do so. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). Moreover, petitioner has demonstrated neither cause and prejudice nor actual innocence. Accordingly, this Court cannot review the merits of petitioner's seventh ground for habeas relief.

## II. Petitioner's Remaining Two Grounds for Habeas Relief are Without Merit

Petitioner's first and sixth grounds for habeas relief are not procedurally barred. These grounds raise claims which were fully exhausted in State court; both claims were raised at every level of State court, and were phrased on direct appeal in a way that alerted the court below to the federal constitutional nature of the claim. In the first claim, petitioner asserted that the trial court violated his Fourteenth Amendment Due Process right to present a defense by precluding

30

petitioner from testifying that, in coercing petitioner into participating in the post-murder crimes, Smelefsky claimed that he had killed before. In the sixth claim, petitioner asserted that the prosecutor violated his Fourteenth Amendment Due Process right to a fair trial by forcing petitioner to call his own niece a "liar" on cross examination. However, although these claims are not procedurally barred, they are both without merit for the reasons set forth below.

For claims that have been fully adjudicated on the merits in State court, a petitioner must show that the State court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.§ 2254(d). Under the terms of subsection (d)(1), habeas relief is warranted "only upon a showing that the state courts unreasonably applied clearly established *Supreme Court precedent*." *Mask v. McGinnis*, 252 F.3d 85, 90 (2d Cir. 2001)(per curiam)(emphasis in original).

## The Right to Present a Complete Defense

The Supreme Court has repeatedly recognized that the right to testify on one's own behalf is a fundamental constitutional right, secured both by the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process Clause, which is extended to state courts under the Fourteenth Amendment. *See Rock v. Arkansas*, 483 U.S. 44, 51-52, 53 n. 10 (1987). In addition, "Supreme Court precedent makes clear that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense." *Wade v. Mantello*, 333 F.3d 51, 56 (2d Cir. 2003). In short, "criminal defendants have the right . . . to put

31

before a jury evidence that might influence the determination of guilt." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988)(quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). A state, therefore, cannot "apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Rock*, 483 U.S. at 55.

However, "the right to present relevant testimony is not without limitation." *Id.* The Supreme Court has repeatedly recognized that this right "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). A defendant's right to present relevant evidence is subject to "reasonable restrictions," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), among which are "state and federal rules of procedure and evidence 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Mantello*, 333 F.3d at 58 (quoting *Chambers*, 410 U.S. at 302).

In this case, the trial court permitted petitioner to testify that he remained silent and participated in the post-murder crimes because of Smelefsky's threats to kill petitioner and his family (T. 893). Petitioner was permitted to testify that he believed Smelefsky's threats (T. 899). However, petitioner was not permitted to testify that Smelefsky said he had killed someone else before and had succeeded in getting away with the murder (T. 882-891). Defense counsel initially represented that he was offering Smelefsky's statements "solely to establish the defendant's [*i.e.*, petitioner's] state of mind with regard to the actions that he took" after the murder (T. 882). However, defense counsel later implied that the testimony was also relevant to petitioner's credibility, since it substantiated his explanation for not reporting the murder to the police (T. 887-88). The prosecution, on the other hand, argued that the portion of Smelefsky's

statement in which he allegedly confessed to a prior murder did not "go to anything other than trying to get this jury to put more blame on Smelefsky" (T. 883). The Court sided with the prosecution, finding that Smelefsky's statements concerning another murder had "no relevance at all" (T. 885).

The trial court's decision was not "contrary to" Supreme Court precedent. The Supreme Court has stated that a state court's decision may be deemed "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). While Supreme Court precedent "clearly establishes the general contours of a criminal defendant's right to present potentially exculpatory evidence," *Mantello*, 333 F.3d at 58, the Court has not articulated specific rules prohibiting a trial court from exercising its discretion to limit a defendant's criminal testimony in the manner that Justice Hanophy did in this case. Thus, in ruling that the trial court "providently exercised its discretion in limiting the defendant's testimony regarding his state of mind at the time of the incident," *Knoesel*, 293 A.D.2d at 551, 742 N.Y.S.2d at 60, the Appellate Division did not reach a different conclusion than the Supreme Court on a question of law. Moreover, petitioner has not cited, and this Court's independent research has not found, a case in which the Supreme Court "arrived at a decision different from the Appellate Division's on 'materially indistinguishable' facts." *Mantello*, 333 F.3d at 58.

Under the second prong of the AEDPA standard, this Court must consider whether the Appellate Division's decision constituted an "unreasonable application" of Supreme Court precedents governing a defendant's right to present a complete defense. A state court decision

33

involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. The reasonableness of the application of the law is to be assessed objectively rather than subjectively. *Id.* at 409-10. Therefore,

> a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411.

In performing the "unreasonable application" analysis, this Court must first determine whether the decision to exclude petitioner's testimony that Smelefsky said he had killed before was objectively unreasonable. In making this determination, this Court is mindful that the type of ordinary evidentiary ruling challenged in this case is "afforded wide latitude by the Constitution." *Mantello*, 333 F.3d at 60. In *Crane v. Kentucky*, 476 U.S. 683, 689 (1986), the Supreme Court acknowledged its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Id.* at 689. The *Crane* Court stated:

> In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. As we reaffirmed earlier this Term, the Constitution leaves to the judges who must make these decisions "wide latitude" to exclude evidence that is "repetitive . . ., only marginally relevant" or poses an undue risk of harassment, prejudice, [or] confusion of the issues."

*Id.* at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

In this case, the decision to exclude petitioner's testimony concerning a small portion of what Smelefsky allegedly said following the murder was not objectively unreasonable. Justice Hanophy permitted petitioner to testify that Smelefsky had threatened petitioner and his family and that petitioner believed these threats. The prosecution did not argue that petitioner lacked a basis for his belief, but rather that petitioner's claim that he was threatened by Smelefsky was entirely incredible in light of the manner in which the murder occurred and in light of petitioner's actions thereafter (T. 1075). The jury, therefore, faced a choice of either crediting petitioner's claim that he believed Smelefsky's alleged threats or discrediting petitioner's claim altogether. Petitioner's explanation as to why he believed Smelefsky was of little, if any, relevance.

On the other hand, testimony that Smelefsky claimed to have murdered before posed a substantial risk of confusing the jury. At trial, defense counsel implied that this testimony would bolster petitioner's credibility, presumably because it explained why petitioner credited Smelefsky's threats. However, such testimony could have bolstered petitioner's credibility only if the jury improperly considered petitioner's testimony as proof that Smelefsky had, in fact, murdered before. Indeed, in arguing that the proffered testimony would "get [the] jury to put more blame on Smelefsky" (T. 883), the prosecutor recognized the danger that the jury would consider the hearsay testimony for the truth of the matter asserted therein. In light of the very limited relevance of the testimony and the substantial risk of confusing the jury, the trial court acted reasonably in precluding petitioner from testifying that Smelefsky claimed to have killed before.

### The Alleged Prosecutorial Misconduct

Petitioner's sixth ground for habeas relief relates to a single, allegedly improper question asked by the prosecutor upon his cross examination of petitioner. After petitioner denied killing

35

Capobianco on his direct examination and contradicted Sosbee's testimony that petitioner had confessed to her that he participated in the murder, the prosecutor asked petitioner, "And Liz, she lied, didn't she?" (T. 929).

As the trial court acknowledged in emphatically sustaining defense counsel's objection, this question was improper. The Second Circuit has repeatedly admonished prosecutors to "avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987)(citing *United States v. Drummond*, 481 F.2d 62, 64 (2d Cir. 1973); *United States v. Hestie*, 439 F.2d 131, 132 (2d Cir. 1971)(per curiam); and *United States v. Davis*, 328 F.2d 864, 867 (2d Cir. 1964)). In light of this line of Second Circuit cases, at least one court in this district has held that it is improper for a prosecutor to cross examine a defendant in a way that forces the defendant to comment on the credibility of other witnesses. *Smith v. Walsh*, No. 00-CV-5672 (JG), 2003 WL 22670885, at * 5 (E.D.N.Y. Oct. 20, 2003).

Although a single improper question can provide a basis for habeas relief, it can do so only under unusual circumstances. "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987)(internal quotations and citations omitted). Thus, "a prosecutor's unprofessional cross-examination . . . cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974)).

"When a defendant contends that a prosecutor's question rendered his trial fundamentally unfair, it is important 'as an initial matter to place th[e] remar[k] in context.'" *Greer*, 483 U.S. at 766 (brackets in original)(quoting *Darden v. Wainwright*, 477 U.S. 168, 179 (1986)). On direct

examination in this case, petitioner expressly denied having told Sosebee that he murdered anyone (T. 910), or that he grabbed Capobianco while Smelefsky was stabbing him (T. 912-13). Although petitioner never directly accused Sosebee of lying, he implied as much by testifying that he and Sosebee had been "on the outs" and "fighting for two years" prior to the incident (T. 909).

In light of the foregoing, the prosecutor's attempt to force petitioner to make explicit an accusation which was already implicit in petitioner's direct testimony could hardly constitute "egregious misconduct." Moreover, any risk that this single question could result in unfairness to petitioner was all but eliminated when defense counsel immediately objected and the trial court sustained that objection. Indeed, defense counsel did not merely object but stated, in open court, "That's not an appropriate question for the district attorney to ask to have a witness characterize someone else's testimony" (T. 929). Moreover, the court did not merely sustain the objection, but unequivocally endorsed the view that the prosecutor's questioning was improper by characterizing defense counsel's comments as "absolutely true" (T. 929).

This case is somewhat similar to *Greer*, in which the Supreme Court stated, "The sequence of events in this case – a single question, an immediate objection, and two curative instructions – clearly indicates that the prosecutor's improper question did not violate [the petitioner's] due process rights." *Id.*, 483 U.S. at 766. Although defense counsel neglected to request, and the trial court failed to give, an immediate curative instruction, the jury was unquestionably aware that this line of questioning was improper and that the answer should be ignored. In light of *Greer*, this Court cannot find that the State court unreasonably applied Supreme Court precedent in determining that the prosecutor's single improper question in this case did not violate petitioner's due process right to a fair trial.

## CONCLUSION

For the reasons stated above, the instant petition for a writ of habeas corpus is denied. No certificate of appealability is granted with respect to petitioner's claim because petitioner has not made a substantial showing of the denial of a constitutional right.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
August 25, 2006